610 So.2d 1020 (1992)
Nancy Colette GLANKLER, Individually and on Behalf of the Minor, Jennifer Mangel, Plaintiffs-Appellees,
v.
RAPIDES PARISH SCHOOL BOARD, et al., Defendants-Appellants.
No. 91-239.
Court of Appeal of Louisiana, Third Circuit.
December 1, 1992.
Writ Denied March 19, 1993.
*1023 Rivers, Beck & Dalrymple, Joseph Dalrymple, Robert Beck, Kenneth Doggett, Alexandria, for plaintiff-appellee.
Gist, Methvin, Hughes & Munsterman, Howard Gist III, Alexandria, for defendant-appellant School Bd.
Stafford, Stewart & Potter, Mark Watson, Alexandria, for defendant-appellant DHHR.
Gold, Weems, Bruser, Sues & Rundell, Edward Rundell, Alexandria, for defendant-appellee Burke.
Before YELVERTON and KNOLL, JJ., and MARCANTEL,[*] J. Pro Tem.
KNOLL, Judge.
This appeal concerns questions of liability against the Rapides Parish School Board (School Board) and the State of Louisiana, Department of Health and Human Resources (DHHR), as a result of severe injuries a kindergarten student sustained while on a school field trip, and the excessiveness of the awards made for general and special damages, as well as for loss of consortium to the student's mother.
Nancy Glankler, the mother of Jennifer Mangel, individually and on behalf of her daughter, sued the School Board, its insurer, Audubon Insurance Company, and DHHR. Glankler alleged that her daughter, six years of age, a kindergarten student at Nachman Elementary School, broke her leg at the left hip joint on a class outing when she was struck by a 60 pound, metal two-person swing at DHHR's facility at the Parents' Park located on the campus of Pinecrest State School. As a result of this injury, her growth plate in the hip joint was permanently destroyed.
Since the School Board and DHHR were political subdivisions, Glankler's tort claims against them were tried without a jury. The trial court found the School Board and DHHR equally liable, and awarded the following: (1) $500,000 for Jennifer's physical pain and suffering, past and future; (2) $1,000,000 for Jennifer's emotional suffering, mental trauma, and loss of enjoyment of life; (3) $500,000 for Jennifer's disfigurement and permanent disability; (4) $131,536.25 for medical, hospital, and related health care expenses, past and future; and, (5) $250,000 for Glankler's loss of consortium. *1024 The trial court limited the School Board's liability for Jennifer's damages to $500,000, but found Glankler's loss of consortium award exempt from the damage limitation. DHHR's liability for damages was not limited by the trial court because it did not find that DHHR pleaded limitation of liability as an affirmative defense.
The School Board suspensively appealed, contending that the trial court erred: (1) in finding it liable for negligently supervising the kindergarten students; (2) in accepting Paul Hogan, a playground contractor and lecturer, as an expert in playground supervision; (3) in awarding more future medical expenses than was established at trial; (4) in awarding an excessive general damage amount; (5) by awarding an excessive amount to Glankler for loss of consortium; and, (6) in exempting Glankler's loss of consortium award from the $500,000 limitation of liability recognized in the judgment.
DHHR also suspensively appealed, contending that the trial court erred: (1) in finding that DHHR had actual or constructive notice that the metal swing was defective; (2) in holding that the metal swing was a dangerous instrumentality; (3) in making excessive damage awards; (4) in failing to find that DHHR was statutorily entitled to a $500,000 limitation of liability; (5) in awarding more than the legal rate of interest; and, (6) by repeatedly violating DHHR's due process rights.
We reverse the trial court's finding that DHHR was liable, and amend the judgment to bring Glankler's loss of consortium award under the $500,000 statutory limitation of liability, finding the loss of consortium award extinguished by the statutory cap. We also affirm the future medical award.

FACTS
On May 25, 1988, the Nachman Elementary School kindergarten class took an end-of-year field trip to the Parents' Park at Pinecrest State School, a facility owned by DHHR. The Parents' Park is an acre and one-half fenced playground built primarily for the residents of Pinecrest and their families for use on visitation days. In addition, DHHR traditionally made the park available on designated days to schools and other organizations. The park, among other things, was equipped with slides, merry-go-rounds, a wading pool, and 47 metal glider-type swings.
On the day of the field trip, three kindergarten teachers, Janice Riggs, Janet Bakeler, and Earline Pearson, and approximately 11 parents supervised the outing of 78 kindergarten students, with an average age of 5 years. It is undisputed that for several days prior to the trip, the teachers instructed the children about the types of playground equipment that would be available and the different rules they needed to follow. In particular, the teachers instructed the children that they were not to push the swings. Before leaving the school, the teachers reviewed the safety rules with the children and several of the parents in attendance. Upon arrival at the park, a walking tour was conducted, showing the playground to the children and parents. The teachers told the children where to put their change of clothes, and pointed out the areas of the playground that the children were not to use. Again, the teachers instructed the children not to push the swings.
At approximately 10:30 a.m., Jennifer pushed a friend on the glider-type swing. For a better understanding of the metal swing at issue, we have duplicated below exhibit number P-10, a photograph of the glider-type swing for reference:
*1025 
(Unlike the picture above, at the time of the accident, the range of motion of the swing was not limited by chains tethering the swing to the cement pad.) As Jennifer pushed her friend, the swing knocked Jennifer down and struck her again twice on its return swing, severely injuring her.
Summarizing Jennifer's medical treatment, her recovery, and medical projections of future treatment, the trial court stated in its written reasons for judgment:
"After being hit by the swing, some mothers ran and picked Jennifer up, put her under the pavillion and called her mother. Jennifer was unable to walk after the accident and was taken to Cabrini Hospital where it was determined the blow had caused a fracture of the base of the femoral neck. Internal fixation surgery [by Dr. Vanda Davidson, an orthopedist] was scheduled the next day in order to pin the broken bones together in the proper alignment.
The injury sustained by the child will have a severe crippling effect on her for the rest of her life. According to medical depositions, Jennifer had sustained a femoral neck fracture which was complicated by avascular necrosis and premature closure of the growth plate. Avascular necrosis is caused by an interruption of the blood supply to the bone which makes the bone soften and weaken, often leading to collapse. The premature growth arrest is a closure of the growth plate prior to the time it was so destined, resulting in the left femur failing to grow in length.
Jennifer has already undergone two major surgeries since the incident. The first on May 26, 1988, involved the internal fixation of the femoral neck fracture with a closed reduction and pinning on the bone fissure. Following this procedure she was required to spend four(4) months of the summer in a spica or body cast from chest level down to her toes, with her legs wedged apart by a pipe. The second surgery [on June 19, 1989,]... encompassed the removal of the pins. It was after this surgery the doctor discovered there was osteopenia, which means a net decrease in the amount of bone in the area of the physis. The physis is the cartilage plate from which the bones grow axially in length.

*1026 Subsequent to Jennifer's release from the body cast, she was placed on crutches for an entire school year. Then she had an abductor brace affixed to her lower body. An abductor brace is a two-leg brace that fits around the thighs and pulls the legs apart. The brace forces the person wearing it to walk in a crouched, spider-like position. The purpose of the brace is to insure the femoral head is directed into the socket so when the bone collapses, due to avascular necrosis, it will squeeze into a round shape to properly mold into the socket.
The child will require three (3) or four (4) more surgeries during her childhood and early teens. The next surgery to be performed is a muscle transposition, which is necessary to relocate and re-attach the muscle with metal screws to the stunted bone in order to maintain tension in the muscle so her limping will be less noticeable. Afterwards, she will be in a cast for four (4) to six (6) weeks before starting rehabilitation. This surgery will be done when Jennifer reaches eight to ten years of age. A year later, surgery will be required again to remove the screw from the bone, which will include more exercise and rehabilitation.
Jennifer will need another muscle transposition at age thirteen or fourteen involving the same surgery and the follow-up surgery with cast and rehabilitation to follow. When Jennifer has approximately two-to-two and a half years of growth left, she will undergo a surgical procedure in which her good leg's growth plate is killed so as to lessen the length discrepancy between her legs and reduce her limp along with preventing degenerative changes in the spine. The draw-back to this procedure is that it will stunt her height. Each of these muscle transposition operations requires a hospitalization of five (5) days and six (6) weeks in a cast with another six (6) weeks on crutches.
Dr. Davidson stated that it is likely Jennifer will develop significant arthritis in her hip as she grows older, and the two inch difference in leg length will result in pain and stiffness. He also testified that Jennifer will be forced to have replacement of the hip joint sometime between thirty-five (35) and forty (40) years of age because of the pain and stiffness in her hip. The arthritis will prevent her from maintaining any type of normal lifestyle. Depending upon existing technology, Jennifer will have a second hip replacement fifteen (15) years after her first and a third replacement depending upon the joint's durability."

EXPERT TESTIMONY
The School Board and DHHR, urging different reasons germane to an analysis of their respective liability, contend that the trial court erred in qualifying Paul Hogan as an expert. The School Board argues that Hogan was not qualified to testify in the area of child supervision; DHHR contests Hogan's expertise in the field of swing design. Because of our ultimate resolution of DHHR's liability favorable to DHHR, we pretermit discussion of DHHR's argument about Hogan's expertise.
LSA-C.E. Art. 702 allows experts to testify when scientific, technical, or other specialized knowledge will assist the trial court to understand the evidence or to determine a fact in issue if the witness is qualified as an expert "by knowledge, skill, experience, training, or education." Trial courts have great latitude in determining whether or not a person possesses the requisite background and experience to be considered as an expert. Pearce v. Power & Telephone of Kentucky, 533 So.2d 46 (La. App. 3rd Cir.1988).
Elaborating on the admissibility of expert testimony, the court in Adams v. Chevron U.S.A., Inc., 589 So.2d 1219, 1223 (La.App. 4th Cir.1991), writs denied, 592 So.2d 414, 415 (La.1992), commented:
"Although a trial judge has much discretion in determining whether to qualify a witness as an expert, that discretion is not unlimited. Experts who qualify under the relevant provisions of the Louisiana Code of Evidence should be allowed to testify because the jury is entitled to *1027 hear all evidence which will assist it `to understand the evidence or to determine a fact in issue.' La.C.E. art. 702.
The United States Fifth Circuit Court of Appeal has recently interpreted F.R.E. 403, after which the Louisiana rules on expert testimony are patterned. Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.1991). The court delineated the following four inquiries for determining the admissibility of expert testimony: (1) whether the witness is qualified to express an expert opinion, (2) whether the facts upon which the expert relies are the same type as are relied upon by other experts in the field, (3) whether in reaching his conclusion the expert used well-founded methodology, and (4) assuming the expert's testimony passes these tests, whether the testimony's potential for unfair prejudice substantially outweighs its probative value under the relevant rules. Id. We adopt those standards as appropriate for evaluating the admissibility of expert testimony under Louisiana law."
For 30 years Hogan has authored books on the subject of play and playground construction, and has designed and built approximately 450 playgrounds. His books and audio-visual materials are used worldwide by persons, parental groups, and architects who are involved in early childhood education.
Hogan testified that the supervision of children is a topic which is inseparable from the design and construction of playgrounds. Furthermore, Hogan stated that he has testified as an expert in the field of supervision of children 20 to 30 times in both playground design and safety cases. He also stated that he has lectured on the proper supervision of children in the playground setting.
Viewing the record evidence in light of the delineated inquiry espoused in Adams, supra, we cannot say that the trial court was clearly erroneous in its acceptance of Paul Hogan as an expert in the field of child supervision on the playground.

DHHR'S LIABILITY
DHHR contends that the trial court erred in finding it liable for Jennifer's damages. It argues that there was no showing that it had notice, actual or constructive, on which the trial court could have premised liability.
Glankler urged that DHHR was negligent in allowing children to use the swings since they were metal and were not intended for use by small children.
Under general negligence theory the plaintiff must prove that DHHR had actual or constructive knowledge of a condition unreasonably hazardous to the children. Moreover, LSA-R.S. 9:2800 further provides that public entities are not liable for damages caused by a thing in their custody unless they had actual or constructive notice of the defect and have had a reasonable opportunity to remedy the defect, but have failed to do so.
Actual notice is knowledge of dangerous defects or conditions by a public entity either to keep the property in good repair or to report defects and dangerous conditions to the proper authority. Garrett v. Sewerage & Water Board of New Orleans, 235 So.2d 164 (La.App. 4th Cir. 1970).
Constructive notice is defined in LSA-R.S. 9:2800 as "the existence of facts which infer actual knowledge." Likewise, the jurisprudence has established that constructive knowledge exists if the condition is so inherently dangerous that the custodian should have known of it. Clark v. Jesuit High School, 572 So.2d 830 (La.App. 4th Cir.1990), writ denied, 576 So.2d 48 (La.1991).
In the case sub judice, the trial court found that DHHR had constructive notice by the mere presence of the swings on the playground with small children present. The trial court stated in its written reasons for judgment:
"The State cannot disavow knowledge of the defective nature of the swings by claiming it knows nothing. State employees created an unreasonably dangerous situation by furnishing unsecured, *1028 heavy metal swings to small children. This constitutes notice. When unsecured, the swings could be pushed to unacceptable heights which created potential energy capable of crippling the child pushing the swing. The State's claim of no prior accidents is not credible and is of no probative value even if it is true.
* * * * * *
Jennifer Mangel was crippled by a swing provided for her use on State-owned premises and in the presence of State employees. Under the facts of the present case, this Court finds that the State, through employees of the Department of Health and Human Resources, had constructive knowledge of an instrumentality that posed an extremely high risk of danger to young unknowing children such as Jennifer."
Paul Hogan opined that the swing was defective "due to sub-standard design, for use by children." The School Board and DHHR brought third-party products liability demands against the swing designer/manufacturer which are not before us. Glankler did not sue the designer/manufacturer of the swing. Since we find that we do not have to determine whether the trial court correctly concluded the issue of the defective design of the swing, we withhold comment on this question. However, assuming the accuracy of Hogan's determination for purposes of argument, we point out that DHHR neither designed the swing nor did it receive warning from the manufacturer/designer of the swing that the swing was not suitable for use by small children. In the absence of such, we find the design defect, if any, could not have constituted notice to DHHR.
In reaching this conclusion, we find Glankler's reliance on Fontenot v. Soileau, 567 So.2d 815 (La.App. 3rd Cir.1990), writ denied, 571 So.2d 656 (La.1990), misplaced. In Fontenot the city of Ville Platte was found to have constructive notice of a stop sign which was obscured by four years' growth of branches. Building on Fontenot, Glankler argues that the dangerous condition of the swing was obvious to the trial court who visited the scene of Jennifer's accident. With all due respect to the learned trial court, unlike the dangerous condition of the stop sign, which was readily apparent, the danger of the swing only became obvious when it was misused. Therefore, we must look to the record to determine whether DHHR had knowledge of accidents caused through the use of the swings by young children.
Evidence of the absence of other accidents at the same place is relevant and admissible as tending to show that a defendant did not have actual or constructive knowledge of a dangerous condition. Ketcher v. Illinois Central Gulf R. Co., 440 So.2d 805 (La.App. 1st Cir.1983), writs denied, 444 So.2d 1220, 1222 (La.1984).
Pinecrest State School employees testified that no employee had knowledge of any accident ever occurring which involved the metal swings. Even though Glankler elicited testimony from the employees that DHHR did not have a record of Jennifer's accident, we do not find that this alone defeats DHHR's assertion that it did not have knowledge of the design defect of the swing. The testimony shows that the groups who use the Parents' Park facilities are responsible for providing the necessary supervision; accordingly, DHHR's knowledge of any prior accidents rests with those groups who supervised the various activities through the years. In that regard, testimony established that Nachman's kindergarten class had used the Parents' Park for approximately 14 years without any incident ever happening on the swings in question. Glankler introduced no evidence to the contrary either as it affected Nachman Elementary or any other group who used the facility.
A case almost identical in issue to that presented herein is Fragala v. City of Rayville, 557 So.2d 1118 (La.App. 2nd Cir. 1990), writ denied, 561 So.2d 103 (La.1990). In Fragala, it was alleged that a defectively designed barbecue pit owned by the city of Rayville injured the plaintiff when the lid unexpectedly fell on plaintiff's hand. Even though the reviewing court indicated *1029 that plaintiff's evidence preponderated that there was a design defect, it denied recovery, finding that plaintiff failed to prove that the city of Rayville had notice of the defect. The court stated at page 1120:
"The court also found that the only showing of any notice to the city that there might be a problem with the pits was the fact that one of the lids once fell on the mayor. However, the court noted that the mayor testified that he was negligent in causing that accident. The court found that, even though one witness testified that a lid on one of the barbecue pits once fell on his uncle, the uncle did not testify and there was no showing that the city was ever notified of that incident."
See also Morrow v. Sewerage and Water Bd., 562 So.2d 1082 (La.App. 4th Cir.1990); Lewis v. St. Bernard Parish Sch. Bd., 350 So.2d 1256 (La.App. 4th Cir.1977).
The same result is mandated herein. We find that Glankler failed to prove that DHHR had either actual or constructive notice regarding the alleged defective design of the swing, and that the trial court's contrary determination was clearly wrong. Given the many years of accident-free use of the swing by small children, we find that DHHR cannot be held liable for any failure to discover that possibly the swing was defectively designed.
In reaching this conclusion, we are further guided by the analysis utilized in Dunne v. Orleans Parish School Bd., 463 So.2d 1267 (La.1985). The Louisiana Supreme Court in Dunne framed the question before it as follows:
"The critical issue as to ... liability is whether the set of gymnastic rings in an unlocked and unsupervised gymnasium, which was accessible to children who attended the dance recital in the adjacent auditorium and strayed from the auditorium into the gymnasium, presented an unreasonable risk of harm."
Id. at 1268.
Acknowledging that the gymnastic rings in Dunne could be dangerous, the court focused its determination on what was considered the normal use of the gymnastic rings. It concluded at page 1270, "... the gymnastic rings on suspended ropes did not present an unreasonable risk of harm in normal use.... The real culprit was the unidentified child who misused the ring set...."
As pointed out above, it was DHHR's policy to allow outside groups to utilize Parents' Park as long as the visitors supervised their outing. In the present case, we find it was not unreasonable for DHHR to require the School Board to supervise the children. The School Board was the party most familiar with the physical limitations of the kindergarten students, and was in the best position to assess the suitability of the large metal swings for use by such young children. As in Dunne, DHHR's swings, in normal use without pushing, did not present an unreasonable risk of harm. In the case sub judice, as elaborated upon more fully herein, it was the School Board's decision to allow the kindergarten students to use the swings which was the "culprit."
Accordingly, we conclude that it was improper for the trial court to cast DHHR with liability for Jennifer's injuries. Therefore we reverse the trial court's determination that DHHR was liable for Jennifer's injuries, and pretermit discussion of DHHR's remaining assignments of error.

SCHOOL BOARD'S LIABILITY
The School Board contends that the trial court erred in finding it liable for Jennifer's damages. It argues that it afforded reasonable supervision of this kindergarten class activity and that is all that is required.
Although charged with the highest degree of care toward children placed in their custody, supervisors at schools are not absolute insurers of the children's safety and cannot be expected or required to prevent them from falling or striking each other during normal childhood play. Drueding v. St. Paul Fire & Marine Ins., 482 So.2d 83 (La.App. 4th Cir.1986). It is well established in school-related accident cases that supervising teachers must follow *1030 a reasonable standard of care commensurate with the age of the children under the attendant circumstances, and liability is imposed only where there is a causal connection between the lack of supervision and the accident that could have been avoided by the exercise of the required degree of supervision. Prier v. Horace Mann Ins. Co., 351 So.2d 265 (La.App. 3rd Cir.1977), writ denied, 352 So.2d 1042 (La.1977). Likewise, the fulfillment of the obligation owed does not exact individual supervision of each child at all times and places. Comeaux v. Commercial Union Insurance Company, 269 So.2d 500 (La.App. 4th Cir. 1972).
Louisiana jurisprudence has time and again had an opportunity to discuss the ratio of teachers to students in child supervision cases. Synopsizing the holdings of the myriad of cases on this issue, we stated in Rollins v. Concordia Parish School Bd., 465 So.2d 213, 218 (La.App. 3rd Cir. 1985):
"Defendant argues that the children in this class were adequately supervised as a matter of law as the Louisiana courts have held that a school board provided adequate supervision where only one teacher had the responsibility of supervising anywhere from 50 to 120 children. See, e.g. Hampton v. Orleans Parish School Bd., 422 So.2d 202 (La.App. 4th Cir.1982); Batiste v. Iberia Parish School Bd., 401 So.2d 1224 (La.App. 3rd Cir.1981), writ den., 405 So.2d 531 (La. 1981); Capers v. Orleans Parish School Bd., 365 So.2d 23 (La.App. 4th Cir.1978). A review of these and similar cases indicates that the courts actually based their findings of adequate supervision on an examination of whether the supervision was reasonable in light of the age of the children involved and the circumstances surrounding the accident. For example, in Foster v. Houston General Ins. Co., 407 So.2d 759 (La.App. 2nd Cir.1982), writs den., 409 So.2d 660 (La.1982), the Second Circuit Court of Appeal held that one teacher was not enough to adequately supervise ten or eleven mentally retarded teenagers on a three block walk to a basketball court in light of the fact that another teacher was available to supervise the walk and the route taken included crossing a fairly busy intersection."
In the present case, the trial court concluded that the School Board did not provide adequate supervision of the students. The trial court did not include the 11 parents as supervisors finding that the parents were not sufficiently instructed to qualify as supervisors of children. Therefore, the trial court viewed the supervision of 78 kindergarten students by only three teachers. The trial court reasoned as follows:
"The warnings to the parents that were present that morning were not specific enough to be sufficient.
The School Board argues there was proper supervision with the three (3) teachers along with eleven (11) parent supervisors. As stated before, the actual number of parent supervisors is highly questionable. Furthermore, the parents were neither trained nor skilled in the type of supervision required on the day in question. While their presence was sought by the school, it did not add to the professional supervision needed, and I am not really sure if any were aware of the absolute need to keep the children away from the type of swings that caused little Jennifer's injuries. The three (3) teachers on the field trip all have impressive credentials with excellent records in education. The parents of all the children in the Nachman kindergarten class sent their children with the belief and assurance that a sufficient number of trained qualified teachers would be there to look after their children. There were but three (3)! This responsibility is the School Board's alone and may not be delegated under any circumstances. The School Board, through its hiring practices and minimum requirement standard, knows the abilities and training of its employees and can exercise control over them. The School Board was negligent for relying upon the parent supervisors to look after the health and safety of seventy-eight (78) kindergarten children.

*1031 The School Board had no knowledge of the training and background of these volunteer parents nor the authority to direct them. The School Board's negligence becomes even more apparent when at trial it is established some of these parents had no inkling as to their role or duty as designated parent supervisor. Therefore for the purposes of determining proper supervision, these parent supervisors will not be considered. Accordingly, it is the opinion of this Court that under the circumstances, three (3) teachers could not adequately supervise seventy-eight (78) kindergarten children scattered over one and a half (1½) acres.
* * * * * *
The Court has personally visited Parent's Park to see the layout and feel the weight and blunt hardness of the swing. With one hundred (100) pieces of playground equipment spread over almost one and a half (1½) acres, it is a virtual children's wonderland. Within this one and a half (1½) acre area and one hundred (100) pieces of equipment are forty-seven (47) adult swings of the type that crippled Jennifer Mangel. After walking over the playground, I believe, that due to area and numerous obstacles blocking the line of sight of any overseer, it is imperative that many trained adults should be stationed throughout the playground. Each should have had a designated area to watch, so that there would be adequate supervision for safety. The School Board's negligence was therefore the cause of the injuries suffered by Jennifer Mangel."
We have carefully reviewed the record and find that although the School Board was negligent for reasons that we will discuss infra, we find that it was not for lack of supervision. We disagree with the learned trial court on this finding of fact. The record shows that the parents that were there[1] were in fact supervising the children, and therefore, should have been included in determining whether the students were properly supervised. The trial court discounted the parents primarily because the parents did not receive warnings "specific enough to be sufficient." The record shows instances of parent supervision from parents who were not present when the teachers were giving supervisory instructions, and the parents intervened to prevent potential accidents which developed while the kindergarten students played at Parents' Park. Although the record preponderates that all of the parents were not given the safety instructions, we do not find that it was unreasonable for the School Board to complement the supervision with these adults. The parenting skills each adult brought, together with the guidance of the teachers as they walked around Parents' Park, augmented the degree of supervision offered and was reasonable. Therefore, the parents should have been included as supervisors.
It is unrefuted that the three kindergarten teachers began instructing the kindergarten children two to three weeks prior to the outing on safety considerations. With particularity, the teachers emphasized that the children were not allowed to run in front of the swings or to push them. These instructions were repeated on the day of the trip prior to the class' departure for the outing, and were reiterated after the class arrived at Parents' Park.
Three professional kindergarten teachers, having 23, 17 and 15 years' experience, at least one aide, and approximately 11 parents supervised the play activities of the 78 kindergartners at Parents' Park.
Earline Pearson, one of the kindergarten teachers, testified that she and the other two teachers "... circulated around ... to the different areas where the children were playing and making sure that parents were at each place the children were playing."
Likewise, Janice Riggs, the most experienced teacher explained their plan of supervision as follows:
"... I asked my room mother, Mrs. Monceaux, to assist me in making sure the *1032 parents were in all the play areas with the children and what we did and what we have chosen to do so many years in the past was that the teachers were what I will refer to as `rovers' and we freed ourself so that we would be able to walk around the park area and make sure that the children, you know, were being supervised and that there were adults in each area of the park and basically that is what we did. The parents, we asked them, of course, to be mindful of not only their child but of the other children's play activities."
Glanker contends that the teachers were congregated at the time of the accident some distance from the swing where Jennifer was. Although the evidence shows that the teachers were together at the time of Jennifer's accident, the record does not preponderate that the three teachers were not supervising the play activity of the kindergartners, or that they abandoned their plan of supervision.
Glanker further contends that Paul Hogan analyzed the teachers' supervisory plan, and determined that it was flawed. Although Hogan may have been able to devise a better plan of supervision, we cannot say that the plan implemented by the teachers, the aide, and parents in the case sub judice did not meet a reasonable standard of care commensurate with the age of the children and the attendant circumstances. We find the plan of supervision used by the School Board to be reasonable and that is all that is required. Prier, supra. It is always easier to come up with a better plan after the accident. To say that a better plan of supervision would have prevented the accident is too speculative because an accident can happen within a matter of a few seconds when, for example, a supervisor is correcting another child. Rather than try to arrive at a magic number of supervisors per number of children, the jurisprudence wisely requires a reasonable standard of care commensurate with the age of the children and the attendant circumstances. There is no requirement that the supervisor of children have each child under constant scrutiny. Brooks v. Orleans Parish School Bd., 560 So.2d 633 (La.App. 4th Cir.1990).
While we find the School Board provided reasonable supervision of the children, we find the School Board was negligent in allowing the kindergarten students to swing on swings that posed an unreasonable risk of harm to small children. This was the cause in fact that set this whole accident in motion.
In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other factors which might increase or decrease the risk of harm to that person. Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1047 (La.1979).
It is undisputed that the swing Jennifer was pushing weighed approximately sixty pounds, was made of metal, and hung from steel straps suspended from posts which were anchored in a concrete slab beneath it. It was likewise unrefuted that the kindergartners' feet could not touch the ground when they sat in these adult swings. Even at the time of trial, approximately two years post-accident, Jennifer's feet still could not touch the ground when she sat in the swing.
Likewise, DHHR personnel and administrators testified that the metal swings had been incorporated into Parents Park since 1975. This park services the permanent residents of Pinecrest and their families when they visit. It was undisputed that the Pinecrest residents are much older and larger than Jennifer and the other kindergarten students. More specifically, the Pinecrest residents are older adolescents and other adult-sized individuals whose feet touch the ground when they sit in the metal swings.
Paul Hogan testified that although parents would not have recognized that the swings were not safe for these children, teachers and school administrators should have known that these swings presented a hazard. The following testimony depicts Hogan's expert opinion:
*1033 "Q. Your testimony is that this is not a proper playground apparatus for healthy 5 and 6 year old kids?
A. That's correct.
Q. And certainly 47 of them would be totally inappropriate playground toys for 5 and 6 year old kids?
A. Yes, sir.

* * * * * *
Q. What should their [the teachers'] instructions have been to these kids with regard to those 47 swings, like the one we're talking about?
A. I think they should have been advised to stay off them altogether.

* * * * * *
A. Well, you know, ... a swing is to swing and so if they can't swing it one way they'll swing it another.
Q. Like pushing it?
A. That's correct.
Q. A proper supervision would have disallowed any play on those swings and would have so notified the parents?
A. Absolutely."
Hogan ultimately recognized that because the children's feet could not touch the ground, the repeated instructions given to the kindergarten students not only prior to the trip, but also on the day of the visit, were insufficient since it is the nature of children to attempt, in some way, to get the swings to move with them in it. Therefore, Hogan opined that by allowing the children to sit in the swings, the pushing of the swings, the forbidden activity, was inevitable. We agree.
Two similar cases to the case sub judice are Comeaux, supra, and Drueding, supra. In Comeaux, a girl, five years of age, severed the distal phalanxes of her ring and middle fingers when a desk toppled over when she sat on the desk top while preparing for an activity at a summer instructional day camp; the children had been warned not to sit on the desk tops. In analyzing the day camp's tort liability, our brethren of the Fourth Circuit found that the operator of the day camp provided sufficient supervision of the children within the parameters set out in Louisiana jurisprudence. Nevertheless, the reviewing court approved the trial court's finding that the operator was negligent for exposing children, 5 and 6 years of age, to the hazards of the unstable desks. In addition, the reviewing court noted at page 502:
"Obviously the defendant [the day camp operator] was aware that the desks posed a continuing potential hazard, as evidenced by his repeated warnings of this danger to the counselors and, through them, to the children. His failure to take the necessary and reasonable precautions to minimize these dangerous elements constitutes negligence."
Similarly, in Drueding a daycare center was found liable for injuries a five year old suffered playing frisbee on the nursery school ground. Affirming the trial court's imposition of liability, the appellate court stated at page 86:
"The testimony ... support[s] a conclusion that the defendant day care center was negligent in permitting Erik [the injured child five years of age] and his companions to engage in frisbee throwing in a confined play area where it was foreseeable that children of his young age could injure themselves in collisions with each other while jumping for the flying toy."
Thus the court in Drueding focused on the seemingly innocuous game of frisbee and imposed liability because the day care center should not have allowed the activity to take place because of its small playground. Accordingly, liability in Drueding was affirmed because of the school's failure to minimize danger by excluding frisbee throwing on this particular playground.
In the case sub judice, we find that the analysis utilized in Comeaux and Drueding is equally applicable herein. The warnings issued by the teachers indicate an awareness on their part that there existed a potential hazard when the swings were pushed. This was even more telling in the present case because the children were visiting Parents' Park for the first time. The *1034 kindergartners' playground at Nachman Elementary had no swings; so suddenly the children were confronted at Parents' Park with 47 large metal swings which they could sit in; their feet could not touch the ground, and they were not allowed to push the swing. The inevitable question then is how were the children supposed to swing? The School Board offered no plan, but allowed the children to use the swings. This failure by the School Board to minimize the danger by taking necessary and reasonable precautions, e.g., to exclude the heavy metal swings for use or to require adults to swing with the children, constitutes negligence. Therefore, for these reasons we find no error in the trial court's conclusion that the School Board was liable for the damages Jennifer suffered.

JENNIFER'S GENERAL DAMAGES
The School Board has attacked Jennifer's general damage award as an abuse of the trial court's discretion.
Earlier in this opinion, we detailed the trial court's description of Jennifer's injuries and her future prognosis. There is no doubt that Jennifer's injury was severe, and will affect the quality of the remainder of her life. Even though we find that the trial court's damage award of $500,000, the statutory cap, is on the high side, considering the constraints of Reck v. Stevens, 373 So.2d 498 (La.1979), and its progeny, we cannot state that it constitutes an abuse of discretion. Because of Reck, supra, it would be a futile exercise on our part to detail our review of the trial court's assessment of damages. Therefore, we shall affirm the trial court's general damage award up to $500,000, the limitation of the School Board's liability, as expressed in the judgment of the trial court.
We point out that in a recent case involving a seventh grade student who suffered injuries similar to Jennifer's, we affirmed an award of approximately $375,000. Jolivette v. Iberia Parish School Bd., 601 So.2d 812 (La.App. 3rd Cir.1992).

FUTURE MEDICAL EXPENSES
The School Board contends that the trial court erred in its assessment of medical expenses. Although it refers in its assignment of error to both past and future medical expenses, it has only detailed its objection to items of future medical expenses. Accordingly, we find that the School Board has abandoned any objection it may have to the $11,676.25 incurred for medical treatment as of the trial date.
The School Board first contends that the trial court's inclusion of future medical expenses for a second muscle transposition surgery was manifestly erroneous. Dr. Davidson, Jennifer's primary treating orthopedist, stated that Jennifer would probably need the second muscle transposition surgery to better normalize her gait. The estimated cost of $12,020 for each surgery is well supported by the evidence. Accordingly, we cannot say that the trial court was manifestly wrong in its inclusion of future medical expenses for both of these muscle transposition surgeries.
The trial court also included at least $8,370 for future surgery which would surgically destroy the growth plate in Jennifer's non-injured leg. The purpose of this surgery would be to make both of Jennifer's legs approximately the same length. Here, too, we find that the medical evidence fully supports the trial court's inclusion of this item of damages.
Lastly, the School Board contends that the trial court's award for future medical expenses erroneously included an amount for three hip replacements. In making this award, the trial court stated:
"Dr. Davidson stated that it is likely Jennifer will develop significant arthritis in her hip as she grows older, and the two inch difference in leg length will result in pain and stiffness. He also testified that Jennifer will be forced to have a replacement of the hip joint sometime between thirty-five (35) and forty (40) years of age because of the pain and stiffness in her hip. The arthritis will prevent her from maintaining any type *1035 of normal lifestyle. Depending upon existing technology, Jennifer will have a second hip replacement fifteen (15) years after her first and a third replacement depending upon the joint's durability. It is very clear to this Court that Jennifer's future is bleak and will be filled with surgery, pain, scars, mental anguish and despondency. This little girl will be faced with more physical restriction, agony and anxiety than one can begin to imagine."
Both Dr. James Bennett, Jennifer's consulting/treating pediatric orthopedist, and Dr. Davidson candidly admitted that it would be difficult for them to predict how many hip replacements Jennifer would need during her lifetime. Both orthopedists did, however, focus on Jennifer's young age at the time of her injury, and their expectations that she would develop significant arthritis as she grew older. The trial court gave Jennifer's prognosis on this issue the worst case scenario. The medical evidence reflects the doctors struggled in guessing at how many future hip replacements Jennifer would require. We interpret the medical opinions on this issue as though the doctors could reasonably foresee two hip replacements; a third hip replacement became more dubious to predict. The trial court accepted and awarded for three hip replacements. We cannot say this was an abuse of discretion. Accordingly, we affirm the award for future medical expenses.

GLANKLER'S LOSS OF CONSORTIUM
The School Board next contends that the trial court erred in finding that Glankler's $250,000 award for loss of consortium was an independent claim subject to a statutory liability limitation separate from that which applied to Jennifer's award. It argues that Glankler's claim for loss of consortium was derived from Jennifer's and was thus controlled by the same statutorily recognized liability limitation. We agree.
LSA-R.S. 13:5106(B)(1) provides:
"B. (1) In any suit for personal injury [involving the state or a state agency or political subdivision], the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars."
Louisiana has established a cause of action for loss of consortium, service and society. Shepard v. State Farm Mut. Auto. Ins., 545 So.2d 624 (La.App. 4th Cir. 1989), writ denied, 550 So.2d 627 (La.1989). This right of damage recovery is authorized by LSA-C.C. Art. 2315 which provides as follows:
"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Damages may include loss of consortium, service, and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person."
Commenting on Shepard, supra, our brethren of the Second Circuit stated in Aldredge v. Whitney, 591 So.2d 1201, 1207 (La.App. 2nd Cir.1991):
"In Shepard, supra, Gregory Shepard sustained permanent devastating brain damage in a vehicular collision. Gregory's parents, the Shepards, filed claims against multiple parties. All were settled or dismissed except those involving the uninsured motorist insurer, United Services Automobile Association (USAA). After trial, a jury awarded Gregory the $200,000 policy limit. The trial court awarded $100,000 plus interest to each of the Shepards for the loss of consortium claims. On appeal, USAA asserted that the Shepard's loss of consortium award was not a separate bodily injury claim and that the loss of consortium claimant cannot recover after the per person limits of the policy are exhausted.
After examining Albin [v. State Farm Mutual Automobile Insurance Co., 498 So.2d 171 (La.App. 1st Cir.1986), writ denied, 498 So.2d 1088 (La.1986) ] and Carroll [v. State Farm Insurance Co., 519 So.2d 265 (La.App. 5th Cir.), writ denied, *1036 520 So.2d 756 (La.1988)], the Shepard court reasoned as follows: A loss of consortium action is a derivative claim of the primary victim's injuries. The derivative claim does not come into existence until someone else is injured. Because the right of action in the loss of consortium claim is derived from the primary victim's injuries, recovery is restricted to the policy's per person limits. Therefore, if the injured party exhausts the per person limits, the derivative claim is extinguished. See Shepard at 629."
Based on the rationale in Shepard and the cases cited therein, we find that Glankler's consortium claim is derived from Jennifer's injuries. Furthermore, in the case sub judice, although we are not faced with a question of insurance coverage and the limitations of recovery related thereto, we find that a factual parallelism exists herein which makes the reasoning of Shepard peculiarly applicable. In the present case, we have affirmed Jennifer's general damage award to the statutory cap of $500,000. Accordingly, Jennifer's award can be likened to the per person policy limitations which applied in Shepard. Since we have concluded that Jennifer's general damages are limited under LSA-R.S 13:5106(B)(1) to the sum of $500,000, she has exhausted the total amount of recovery allowed her by statute. Therefore, we find that Glankler's derivative claim is extinguished. Shepard, supra.
For the foregoing reasons, the judgment of the trial court is reversed in part, affirmed in part, amended in part, and in all other respects, it is affirmed. The affected portion of the judgment is recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the State of Louisiana, Through the Department of Health and Human Resources, dismissing the claims of Nancy Colette Glankler, individually and for and on behalf of her minor child, Jennifer Mangel, against it with prejudice.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Nancy Colette Glankler as tutrix and for and on behalf of Jennifer Mangel, and against the Rapides Parish School Board in the full sum of $500,000 for general damages together with legal interest thereon from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the Rapides Parish School Board and against Nancy Colette Glankler finding that her derivative claim for loss of consortium is extinguished by the general damage award made to Jennifer Mangel under LSA-R.S. 13:5106(B)(1).
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Rapides Parish School Board is cast with all costs of the trial court in the amounts specified in the trial court judgment dated November 15, 1990. Costs of this appeal are assessed to the Rapides Parish School Board.
REVERSED IN PART, AMENDED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[*] Judge Bernard N. Marcantel, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] The record is not clear as to the exact number of parents who were acting as supervisors at Parents' Park, but it was generally accepted that no less than 11 nor more than 14 were present, as the parents would come and go at different times.