872 So.2d 1166 (2004)
Harold ENGLES and Alicia Engles
v.
CITY OF NEW ORLEANS and The New Orleans Sewerage and Water Board.
No. 2003-CA-0692.
Court of Appeal of Louisiana, Fourth Circuit.
February 25, 2004.
Rehearing Denied May 28, 2004.
*1170 Mark P. Glago, Robert G. Harvey, Sr., and Frank J. Swarr, Mickey P. Landry, Landry & Swarr, L.L.C., New Orleans, LA, for Plaintiffs/Appellees.
Frank B. Hayne, III, Assistant City Attorney, John Smith, Deputy City Attorney, Kimlin S. Lee, Deputy City Attorney, Albert A. Thibodeaux, Chief Deputy of Litigation, Sherry S. Landry, Acting City Attorney, New Orleans, LA, for Defendant/Appellant.
Mary-Elizabeth Paltron, General Counsel, Jacob Taranto, III, Assistant Special Counsel, John D. Lambert, Jr., Special Counsel, Sewerage & Water Board of New Orleans, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge LEON A. CANNIZZARO JR., and MOON LANDRIEU, Judge Pro Tempore).
MOON LANDRIEU, Judge Pro Tempore.
The City of New Orleans ("City") and the New Orleans Sewerage and Water Board ("S & WB") appeal the December 23, 2002 judgment awarding damages to the plaintiffs, Harold and Alicia Engle,[1] for injuries in a personal injury accident in which Harold Engle fell from his bicycle.

FACTS
The incident occurred on April 23, 1998, when Harold Engle was riding his bicycle without a helmet at the intersection of Woodlawn and Homedale Streets about a block or two from his residence in the lake area in New Orleans. Mr. Engle asserted that the front wheel of his bike struck the edge of a ridge or depression, and the back of the bike flipped into the air, causing him to be thrown to the pavement. As a result of his fall, Mr. Engle stated that he was briefly unconscious, suffered facial lacerations, as well as a tear or avulsion of his left ear, and pain to his shoulder. Harold Engle was treated at the Emergency Room at East Jefferson Hospital and was discharged. Over the next four years, Harold Engle was treated by various physicians.
On December 17, 1998, Harold and Alicia Engle filed a petition in civil district court, naming the City and the S & WB as defendants. The plaintiffs alleged that the defendants were liable under theories of strict liability, premises liability and negligence due to their failure to maintain and repair the street. The plaintiffs claimed that Harold Engle suffered injuries, including permanent brain damage.
After a bench trial on October 21-23, 2002, the trial court rendered judgment in favor of the plaintiffs, and against the City and S & WB, with each defendant being 50 % at fault. The judgment awarded Harold Engle $1,000,000 for general damages, $2,010,115 for future lost wages, and $17,681.85 for medical/special damages. The trial court awarded Alicia Engle $100,000 for loss of consortium.
The defendants' appeals followed.
On appeal the City and the S & WB contend that the trial court erred in: (1) finding that the defendants previously had received notice as required under La. R.S. 9:2800; (2) failing to find that the plaintiff Harold Engle was comparatively negligent; (3) awarding separate recoveries against two governmental entities under two $500,000 caps; and (5) awarding Harold Engle damages for future lost wages. *1171 The defendants also contest (6) the award to the wife, Alicia Engle, for loss of consortium. The City and the S & WB each denied liability and alternatively argued that the other defendant was responsible for the condition that caused the accident.

LIABILITY
In a claim against a public entity, based on negligence or strict liability, a plaintiff has the burden of proving that: (1) the thing which caused damages was in the care, custody, and control of the defendant; (2) the thing had a vice or defect which created an unreasonable risk of harm to others; and (3) the defect in the thing was a cause-in-fact of the resulting injury; and (4) the public entity had notice of the defect under La. R.S. 9:2800, but failed to take corrective action within a reasonable time. Joseph v. City of New Orleans, XXXX-XXXX (La.App. 4 Cir. 3/5/03), 842 So.2d 420.
The Louisiana Department of Transportation and Development ("DOTD") has a duty to keep the roadway in a reasonably safe condition, to discover any unreasonable dangerous condition, and either correct the condition or warn of its existence. Delphen v. Depart. of Transp. and Development, 94-1261 (La.App. 4 Cir. 5/24/95), 657 So.2d 328. The DOTD is not the guarantor of safety for travelers; its duty is only to make sure the road is reasonably safe for traffic. Ryland v. Liberty Lloyds Ins. Co., 93-1712 (La.1/14/94), 630 So.2d 1289. New Orleans' public entities also have the duty to keep the roadway in a reasonably safe condition.
The court must weigh the magnitude and the probability of injury against the burden of preventing the injury. Entrevia v. Hood, 427 So.2d 1146 (La.1983). Similarly, "[c]onsiderations to determine whether the roadway is unreasonably dangerous are: the gravity of the harm presented, the utility of the thing, the cost of correcting or reducing the risks, and the societal rights, obligations, expectations and values." Delphen, supra, p. 10 (La. App. 4 Cir. 5/24/95), 657 So.2d at 335.

Notice
In the present case, the defendants each argue that the condition of the street was not reported to them, and each defendant did not have actual or constructive notice of the particular defect, which is essential under La. R.S. 9:2800 for recovery of damages against a public entity.
The former City Streets Department employee, Ellis Gusler, testified on behalf of the plaintiffs. He recalled "severe subsidence" at the intersection and referred the problem to the S & WB. The City notes that Mr. Gusler's findings were included in the City Public Works Complaint System Work Order No. 58611, with an opening date of April 23, 1996. The work order reflects Mr. Gusler's date of inspection on May 23, 1996. The S & WB points out that although Mr. Gusler stated that he did a dye test, found a leak and referred it to the S & WB, there is no record of the dye test.
The next notation was on January 30, 1997, which showed that a service cut needed asphalt at Homedale/Woodlawn. The City submits that the notation shows that the inspection was not done by Gusler but by someone named "Harris," and Harris did not appear at trial. With the testimony of John Coffer, the S & WB's previous Chief of its Networks Department, the S & WB's exhibit showed that the S & WB's crew asphalted a four-foot by four-foot portion of the intersection area surface that was near a manhole cover near the curb. The date of completion was April 3, 1997, two months later. The City asserts that the repaired asphalt was done by the S & WB. The City maintains that there was no showing that the City had *1172 actual or constructive notice of any defect in the area where the plaintiff fell.
The S & WB contends that the streets in the entire area were and are in a rutted and bumpy condition. The S & WB argues that the area of the crack or ridge in the street was not a part of the S & WB facility. If the condition had been caused by a S & WB defective line, the street would have collapsed in an entirely different manner. John Huerkamp testified that settlement of the soils, or subsidence, caused the ridge. He said that none of the S & WB's subsurface utilities, sewer or drain lines were located in the near vicinity of the ridge in question. Mr. Huerkamp related that the S & WB was required to place paving tags after applying the surface asphalt, and no paving tags appeared at the location of the ridge in question.
Neighbors, Ms. Hilda Thibodaux, Ms. Pearl Lopes, and Ms. Catherine Nastassi, testified in their depositions that they had complained of the condition of the intersection to the S & WB and the City.
The parties provide conflicting testimony as to whether the City and/or the S & WB had notice of the defective ridge where Mr. Engle fell off of his bicycle. The record provides sufficient testimony upon which the trial court reasonably could conclude that the City and the S & WB had notice of the defect.
The plaintiffs also point out that the City never pleaded the affirmative defense of lack of notice under La. R.S. art. 9:2800. The public entities' statutory exemption from liability under La. R.S. 9:2800 is in the nature of an affirmative defense which must be specifically set forth in the defendant's answer to the petition. See White v. City of New Orleans, 2000-2683 (La.App. 4 Cir. 1/9/01), 806 So.2d 675. In the present case, the City's answer did not reflect the affirmative defense, and therefore, the defense should not be considered on behalf of the City.

Defect
The City and the S & WB contend that the trial court erred in finding that the ridge in question was defective. They argue that the roadway rises up less than two inches and the ridge was an insignificant crack in the surface that was not severe or inherently dangerous.
The S & WB also points out that under a duty/risk analysis the trial court must balance the likelihood and magnitude of harm against the utility of the thing and the cost of prevention, citing Socorro v. City of New Orleans, 579 So.2d 931, 939 (La.1991).
Mr. Robert Lipp, an expert in civil engineering and accident reconstruction, testified on behalf of the plaintiffs that the intersection was full of bumps, irregularities and cracks. Mr. Lipp asserted that the defect where the accident occurred would not be readily apparent or visible to a normal approaching bicyclist going a normal rate of speed. He stated that "it basically, the road goes up to a peak and then it drops off on the other side." Mr. Lipp testified that the depression in the street that caused Mr. Engle's accident posed an unreasonable risk of harm to the reasonable bicyclist. He opined that a reasonable bicyclist approaching the depression at 15 miles per hour could not be expected to see the defective ridge as he approached or have reason to expect what happened to Mr. Engle.
Although the City argues that Mr. Engle was traveling at an excessive speed, the plaintiffs maintain that the City did not provide evidence that the speed was excessive under the circumstances. Mr. Lipp calculated that Mr. Engle's approximate rate of speed was 15 miles per hour, and *1173 that speed was a "very reasonable rate of speed for a bicyclist."
Dr. Frank Griffin, an expert in physics and accident reconstruction, agreed that the ridge in question created an unreasonable risk of harm to a bicyclist.
We cannot find that the trial court was manifestly erroneous or clearly wrong in finding that the street was defective and caused Harold Engle's injuries.

Apportionment of Fault
The trial court found that the City and S & WB were both 50 % at fault for the accident. Under La. C.C. art. 2317 strict liability is based on the relationship between the party (parties) with custody and the thing posing an unreasonable risk of harm to others. Ehrman v. Holiday Inns, Inc., 94-0312 (La. App, 4 Cir. 3/29/95), 653 So.2d 732, 736. The article imposing liability is based on custody and not ownership. Id. In Thumfart v. Lombard, 613 So.2d 286, 290 (La.App. 4 Cir. 1993). This Court stated:
Custody, distinct from ownership, refers to a person's supervision and control (garde) over a thing imposing an unreasonable risk of harm. Loescher v. Parr, 324 So.2d 441, 446 (La.1975).... Our Louisiana Supreme Court has recently used a two part test in determining whether the defendant has custody. First, the defendant should have a right of direction and control over the thing. Second, a court should examine what, if any, kind of benefit the defendant derives from the thing. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991); King v. Louviere, 543 So.2d 1327, 1329 (La.1989).

Id., 613 So.2d at 290.
In the present case, the City asserts that Ellis Gusler, the former City Streets Department employee, did a dye test and concluded that the ridge in the street was caused by a leak in the S & WB's sewer line. He testified that he recalled severe subsidence at the intersection and referred the problem to the S & WB. Mr. Robert Craft, an inspector for the City's Department of Streets, stated that the problem was a cave-in of a sewer line. The plaintiffs state that Mr. Craft, drew an "x" on the same spot in the street that he inspected on March 9, 1995, and that was the same spot where the plaintiff fell.
The S & WB maintains that the condition of the ridge was caused by the nature of the soils and subsidence experienced in the area. Given the soils in the location, if the condition had been caused by a defective sewer or drain line, there would have been a street collapse of a completely different sort according to John Huerkamp. The subsidence was created by the settlement of the soils. None of the subsurface utilities located in the near vicinity of the crack required a repair by the S & WB that would necessitate an excavation and subsequent paving of the location. Although work was done in the area of the intersection, it was not at the location where the plaintiff claimed his accident occurred. The excavations or cuts made by the S & WB were not at the location of the ridge. The S & WB noted that Mr. Huerkamp explained that the S & WB customarily placed tags where the S & WB performed any excavations or cuts. There was no evidence of the S & WB tags in the area where the accident occurred. Further, although Mr. Gusler stated that he performed a dye test, there is no record that a dye test was done. Mr. Gusler could not say precisely where the location of the defective ridge occurred.
John Coffer, a civil engineer, retired after working for 25 years for the S & WB. He testified that he had been Chief of Networks and the head of the Pressure Department. He explained that the S & WB was responsible for sewers and drains, *1174 including repairs to the water lines and sewer force mains, or pressure pipes. The S & WB had its own Paving Department that took care of paving where sewer and drainage repairs were made. If a leak in a sewer line caused a depression, the S & WB would repave that area. The S & WB Paving Department did maintenance of the City streets where there was a "cut" done by the S & WB that was less than five years old. He stated that the City, as opposed to the S & WB, pays for new drain lines less than 36 inches. When the S & WB had no money, the City's Streets Department paid for drainage whenever the City redid the street.
Mr. Coffer explained that a one and one-half inch blue paving tag, with the date on it, was placed in a "cut" that was made by the S & WB to indicate what year it was done. The S & WB was responsible for its "cut" for five years, if there were anything to be redone in that particular "cut." After five years, the City was responsible for maintaining the street in the area of the "cut." Mr. Coffer testified that he inspected the intersection in the morning before he came to court to testify. He saw no paving tag.
Mr. Coffer related that the City's Street Department does not use tags. Mr. Coffer stated that the City's Street Department was responsible for repairs related to general soil subsidence.
William Gwyn, an expert in the area of geotechnical (soils) engineering, testified on behalf of the S & WB. He found that there was a lot of differential subsidence in the area of Mr. Engle's accident. He explained that organic deposits are not uniform. As ground water lowers, deposits deteriorate. He noted that large trees cause the ground water level to be lowered near the tree roots. During the ongoing biodegradation process, some deposits disintegrate more in some areas than in others. The repaving of streets also causes subsidence, where settlement would occur within about two years, and the ultimate settlement would occur within five to ten years. If a patch is put on a location, he would not expect it to subside more rapidly than some other area around it. Mr. Gwyn expected a lot of differential settlement continuing over many years.
Mr. Gwyn agreed that the drain lines were originally installed at least 50 years ago and that bad sewer lines exist in the City. Mr. Gwyn disagreed that there was a "cut" in the accident area. He did not test the soil at the corner of Woodlawn and Homedale. He stated that the settlement or subsidence of the street was due to the decline in the ground water level.
John Huerkamp was accepted as an expert in the areas of mechanical, environmental and civil engineering. He testified on behalf of the S & WB where he was employed since 1973. He was involved in the design, maintenance and installation of gravity sewerage.
Mr. Huerkamp researched records of the Homedale/Woodlawn intersection. He reviewed various maps and S & WB records. He referred to an agreement between the S & WB and the City's Department of Streets, initially in effect in the late 1980's with a current agreement still in effect. The agreement was that the drain lines smaller than 36 inches are considered to be part of the street's structure and not part of the S & WB's maintained drainage system. Under the agreement, the S & WB maintains the drain lines smaller than 36 inches if funds are available. Mr. Huerkamp remarked that if the majority of the drainage system lines were bad, the S & WB would refer that particular system back to the Department of Streets to be assessed as a capital replacement. Mr. Huerkamp related that under the agreement, the S & WB agreed to provide maintenance services for the City's Department of Streets but the S & WB did *1175 not accept ownership or responsibility. The S & WB helped provide maintenance under the agreement because the City Department of Streets did not have crews to do maintenance on the drain lines. It was the S & WB's policy to fix them, including the 24 and 18 inch drain lines.
Mr. Huerkamp stated that: "And I might add, on the lake side of Homedale in the intersection, there is no water line.... The water line exists on the river side of Homedale and then there's no other water lines in the intersection. The water services are also in theusually in the back alleys or in the side streets." The sewer line was down the middle of the street. This was not under the area where Mr. Engle's accident occurred. Mr. Huerkamp referred individually to each record of work done by the S & WB in the area. The repairs that were done were not in the location of the accident, and he found no "cut" in the vicinity of the accident.
Mr. Huerkamp noted that by ordinance, the S & WB must identify their cuts with utility tags that were dated. No tags were found in the area where Mr. Engle was injured. Mr. Huerkamp reviewed the photographs of the location of the ridge. He said that: "It does not appear to be a servicea service cut over any of the lines maintained by the Sewerage & Water Board. It's just a large asphalt patch that normally would be used to level off the intersection." He attributed the uneven levels in the street to "[n]ormal ground subsidence in the area."
Mr. Huerkamp stated:
If there was a defect in one of the Board maintained facilities, you would see a very abrupt cavern form over that leak, especially in thisin this type of environment with the sandy soils and then the organic soils. You'd see a void. It wouldn't be a gradual subsidence, it would be a sudden drop in the roadway over the utility.
Mr. Huerkamp did not see any abrupt cavern in the location of the accident.
Considering that there was no record of the dye test performed by Mr. Gusler for the City; that there were no S & WB paving tags in the area; and that no S & WB's sewer or water lines existed under the street in the area of the defective ridge, the trial court was manifestly erroneous and clearly wrong in finding that the S & WB was liable for the plaintiff's injury. Further, considering that general soil subsidence is attributable to the area of the ridge where the City had custody and control, this Court finds that the City had garde or custody of the vicinity of the accident and was responsible for maintaining that portion of the street. The City, and not the S & WB, is completely at fault for causing the unreasonable risk of harm that caused the accident as well as Mr. Engle's resulting injuries, and the City had notice of the defective street.

Issue of Harold Engle's Comparative Negligence
The City argues that the trial court erred in failing to find Mr. Engle comparatively at fault. The City maintains that if the defect had been noticeable, Mr. Engle should have seen it. The City notes that Mr. Engle lived within two blocks from the site of the accident and was familiar with the neighborhood. Further, bicycle riders are subject to the same duties as drivers of motor vehicles. La. R.S. 32:194; Crump v. Ritter, 583 So.2d 47, 50 (La.App. 2 Cir.1991). This includes the duty to keep a proper lookout for hazards at all times. Delphen v. the Department of Transp. and Development, supra, at p. 11, 657 So.2d at 334.
In Bessard v. State, Dept. of Transp. and Development, 94-0589 (La.11/30/94), 645 So.2d 1134, the Louisiana Supreme Court affirmed the finding that the State was completely liable for the plaintiff's injuries *1176 where the plaintiff slipped and fell on cracks in the curb where she crossed the street after leaving a church. The Supreme Court noted that photographs introduced into evidence at trial indicated that from the plaintiff's viewpoint, the cracks in the curb could not be seen. Further, the Louisiana Supreme Court noted that pedestrians could not be expected to constantly look down while walking on a busy street. Ms. Bessard's view was obstructed at the angle that she reached the curb after crossing the grass. Further, she was attempting to step off the sidewalk toward the curb to cross the street so that she "acted as an ordinary, prudent pedestrian by looking up to observe the traffic...." Bessard, 94-9589, p. 5, 645 So.2d at 1137.
In Ehrman v. Holiday Inns, Inc., supra, the plaintiff fell on a slippery substance on the sidewalk that crossed the driving and parking entrance to the front of the hotel. Ms. Ehrman testified that she did not see the slippery substance prior to her fall; however, the "blackish" streak was one to three feet long. The pavement on the entrance/exit was not a dark color like the street. This Court found that the dark slippery streak was not hidden and was large enough to be noticed by the reasonably prudent pedestrian. Because Ms. Ehrman was not crossing the street but was walking straight ahead on the sidewalk, and considering that she did not testify that there was traffic in the vicinity that would avert her attention, the jury properly found that the plaintiff was 20 percent comparatively negligent.
In White v. City of New Orleans, supra, pp. 4-5, 806 So.2d at 677-678, the plaintiff was unaware of the slope on the far side of the curb where she fell. This Court found that she was concerned with the danger presented to her and her young child by an approaching car. She moved hurriedly to and past the curb to get out of the street. This Court held that Mrs. White was not comparatively at fault.
In Hood v. State Through Dept. Of Transp. And Development, 587 So.2d 755 (La.App. 2 Cir.1991), the Second Circuit noted that although the Department of Transportation and Development is not the insurer of the traveler's safety, it cannot knowingly allow a condition to exist which is hazardous to a reasonably prudent motorist.
In the present case, as noted previously, Mr. Lipp testified that in his expert opinion, a reasonable bicyclist approaching the depression at 15 mph could not be expected to see the defective ridge as he approached. Considering that the defective ridge was in the intersection of Woodlawn and Homedale Streets, it would be reasonable to determine that Mr. Engle could not continuously look down at the street. He was at an intersection where he would have to look up to see if there were approaching vehicles and if he could cross the intersection safely. Although this Court may have apportioned a percentage of comparative fault to Mr. Engle, we cannot find that the trial court was clearly wrong or manifestly erroneous in finding that Mr. Engle was not at fault.

DAMAGES
Consideration of the trier of fact's determination of general damages is limited to a review for abuse of discretion on appeal. The discretion vested in the trier of fact is "great," and even vast, in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied sub nom. Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La.C.C. art.1999; Coco v. *1177 Winston Industries, Inc., 341 So.2d 332 (La.1976). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination of an abuse of discretion is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, supra.

General Damage Award Ceiling, Cap or Limit
The trial court awarded the plaintiff general damages subject to two caps of $500,000 each, for a total of $1,000,000. The City and the S & WB argue that the general damage award is subject to one cap of $500,000 combined against the two public entities.
La. R.S. 13:5106 states in pertinent part:
§ 5106. Limitations
A. No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court.
B. (1) In all suits for personal injury to any one person, the total amount recoverable, including all derivative claims, exclusive of property damages, medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars.
* * *
C. If the state or a state agency or political subdivision is held liable for damages for personal injury or wrongful death, the court shall determine:
(1) The amount of general damages exclusive of:
(a) Medical care.
(b) Related benefits.
(c) Loss of earnings and/or support.
(d) Loss of future earnings and/or support.
(2) The amount of medical care, related benefits and loss of earnings and/or support to date of judgment.
(3) Whether the claimant is in need of future medical care and related benefits and the amount thereof; and
(4) Whether there will be a loss of future earnings or support, and the amounts thereof.
D. (1) "Medical care and related benefits" for the purpose of this Section means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services, and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services.
(2) "Loss of earnings" and "loss of support" for the purpose of this Section means any form of economic loss already sustained by the claimant as a result of the injury or wrongful death which forms the basis of the claim. "Loss of future earnings" and "loss of future support" means any form of economic loss which the claimant will sustain after the trial as a result of the injury or death which forms the basis of the claim. (Emphasis added.)[2]
*1178 La. R.S. 13:5106 limits total bodily injury recovery to $500,000 plus interests and costs for only one single instance of negligence against the state or political subdivision. In Coleman v. Deno, 99-2998 (La.App. 4 Cir. 11/6/02), 832 So.2d 1016, this Court found that a trial court's judgment awarding multiple caps for each defendant for one instance of negligence, causing a plaintiff's injuries, must be amended to a single cap of $500,000 for the claimant's damages.
In Conerly v. State, 97-0871 (La.7/8/98), 714 So.2d 709, the Louisiana Supreme Court found that under La. R.S. 40:1299.39(B) of the Malpractice Liability for State Services Act ("MLSSA"), it was the legislature's intent that a claimant should not recover more than that which would be allowed under the same circumstances under the Medical Malpractice Act ("MMA"). La. R.S. 40:1299.39(F) and La. R.S. 13:5106 contain similar language.
In the present case, the City (not the S & WB) was liable for Harold Engle's injuries. His recovery is limited to general damages in the amount of $500,000 for total bodily injury recovery in toto.

Amount of General Damage Award
Where the award for general damages is limited to the ceiling of $500,000 against the City, this Court will review the issue of whether the trial court abused its discretion in assessing the amount of the general damage award.
General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect the victim's life. Delphen v. Department of Transp. and Development, supra; Glasper v. Henry, 589 So.2d 1173 (La.App. 4 Cir.1991). The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific. "The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it `shocks the conscience.'" Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 879 (La. App. 5 Cir.1991).
In the present case, Mrs. Alicia Engle testified about the changes in her husband's behavior that occurred after the accident. She stated that before the accident Mr. Engle did not lose things; however, after the accident, "he loses everything." He locked his keys in the car twice on the same day, and Mrs. Engle testified that he was always losing credit cards.
When Mr. and Mrs. Engle met, Mr. Engle could take care of his "siblings," *1179 including changing diapers and making formula. Now, he can do only one task at a time, and he cannot handle stress. In the middle of talking, he will stare off into space. He never did that before the accident. Harold had other personality changes after the accident. Before the accident, Harold took care of his grandfather who suffered with Alsheimer's disease. Harold was very patient and would do everything for him. Harold was very "easy going" before the accident. Now, he gets rattled easily, becomes paranoid, and gets angry quickly.
Mrs. Engle said that before the accident, Harold would follow a budget and would buy only things itemized on a grocery list. Now, he is very impulsive. She stated: "Now, if given the list, if he remembers to bring the list, if he remembers to actually get anything on the list, he might come home with five pounds of kitty litter. We don't have a cat." Harold said he bought the kitty litter because it was on sale. Ms. Engle related that her husband would bring home 50 or 60 cans of something that they didn't even eat because it was on sale.
Before the accident, Harold was very healthy but since the accident, he has severe headaches. After the accident, Harold talked about contemplating suicide. Mrs. Engle explained that although Harold is able to drive, now she feels more comfortable driving Harold to and from work. The wife must call him to remind him of appointments, and he needs a reminder device similar to a "palm pilot" and calendars to remember things. When Mrs. Engle put information on the device, Harold lost it within a week. The wife had six sets of keys made because he loses them. Ms. Engle related that now he has night terrors, and while he was sleeping, he ran down the street undressed.
Mrs. Engle testified that after the accident, Harold Engle had loss of memory, and he had mood swings as well as personality changes, including paranoia, depression, anger, impulsiveness, and suicidal thoughts. He had violent nightmares and began sleepwalking. Harold Engle had problems keeping his employment, and he was unable to concentrate as a result of the accident.
The plaintiffs note that the medical records of Dr. Howard Katz, psychiatrist, showed that he treated Harold Engle once every six months for the past four years. He prescribed an anti-depressant, Celexa, for Mr. Engle's depression caused by the accident.
Dr. Susan Andrews' report of her neuropsychological evaluation of Mr. Engle performed in November 1999, showed vast damage to the front and left parietal areas of the brain. She found a significant statistical difference in his verbal IQ of 124 and his performance IQ of 105. In her report, Dr. Andrews stated:
[Mr.] Engle has a number of areas in which he is functioning significantly below his predicted, premorbid level of ability.... This gentleman is showing deficits in motor function (bilaterally), visual-motor function (bilaterally), left temporal-parietal function (verbal memory, finger agnosia, speech sounds discrimination, sensory integration), and attention. He tends to be very impulsive. This could potentially be a problem in his work. He needs to stay aware of this tendency.
Dr. Andrews found that Harold Engle was not malingering. She noted that it had been almost two years after the accident, and in a two-year period the brain has already done most of its spontaneous recovery. She opined that Howard Engle "is also showing a definite organic mood disorder."
Dr. Morteza Shamsnia, the plaintiffs' expert in neurology and neuro diagnosis, testified *1180 that he first saw Harold Engle on June 23, 1998. He did not have access to Harold Engle's medical records at the time. Dr. Shamsnia reviewed Harold's medical records a few days before the trial. He diagnosed post-concussion syndrome with post-traumatic headaches and memory dysfunction. He noted Harold's sleep difficulty, nightmares, short attention span, and difficulty with instructions. Dr. Shamsnia opined that Harold suffered organic brain injury involving multiple areas of the brain. He found deficits in motor function bilaterally, leisural motor dysfunctions in the left parietal area that deals with memory, sound recognition and sensory integration. Dr. Shamsnia noted a deficit in Harold Engle's attention, with an impulsive tendency. He indicated that Harold had a definite organic mood disorder. He believed that after two or three years, the plaintiff's condition was permanent and he had reached maximum medical improvement. He found impairment of Mr. Engle's memory, deficits in his motor functions bilaterally, and impaired visual motor functions. Mr. Engle's visual reflexes and speech, as well as his sensory integrations were impaired. Dr. Shamsnia opined that impulsiveness could be caused by a head trauma.
When Dr. Shamsnia saw Harold a few days before, Harold was not able to sustain a twelve-hour work schedule at East Jefferson Hospital and had to change to a less stressful job. Mr. Engle worked in a long-term care facility. Dr. Shamsnia determined that Mr. Engle's problems were causally related to his brain injuries. Dr. Shamsnia agreed that Mr. Engle's memory problems, personality dysfunction, mood disorders, depression and brain injury deficits were related to the trauma he sustained on April 23, 1998.
Where Mr. Engle had no family or personal prior history of sleep walking, Dr. Shamsnia concluded that the sleep walking more probably than not was related to the head trauma due to the accident. Dr. Shamsnia prescribed neuronton, a seizure medication for chronic brain problems and headaches. From the medical records, Dr. Shamsnia found a 30 % decline in Mr. Engle's mental capacity that was causally related to the accident.
Dr. William Dean, an expert in psychiatry, testified on behalf of the S & WB. Dr. Dean said that in the 1998 bicycle accident, Mr. Engle suffered a concussion that was diagnosed at East Jefferson Hospital. He noted that Mr. Engle said that his main problem was impulse control. He stated that Mr. Engle could have symptoms of depression without a brain injury. Dr. Dean did not see anything that he would consider as gross symptoms of brain damage. Dr. Dean had no opinion as to Mr. Engle's brain damage. Dr. Dean did not dispute that Mr. Engle had personality dysfunction or memory dysfunction. Dr. Dean agreed that he deferred to the neurologist's opinion on brain damage, memory loss, etc.
Considering the trauma of the accident, and Harold Engle's physical and mental suffering, the award reduced to $500,000, under the cap against the City, does not shock the conscience. We find no abuse of the trial court's discretion.

Loss of Future Wages and Earning Potential
The City and the S & WB contend that the award of $2,010,115 to Mr. Engle for future lost wages is speculative based on the possibility that Mr. Engle would have become a physician if he had not been injured.
Loss of earning capacity, not just pecuniary loss, is the basis for assessing loss of wages. Folse v. Fakouri, 371 So.2d 1120 (La.1979). In Finnie v. Vallee, *1181 620 So.2d 897, 900-901 (La.App. 4 Cir. 1993), this court stated:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of his past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990). The trial court should consider whether and how much the plaintiff's current condition disadvantages him in the work force. The trial court should thus ask itself what the plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. (Emphasis added and footnote omitted.)
In the present case, the City notes that the plaintiffs' expert on vocational rehabilitation, Cornelius Gorman, testified that Tulane Medical School, where Mr. Engle planned to go, currently receives approximately 8,000 applications each year. Only about 800 or so remain for the next stage, the "interview level." The City points out that from the interview level only five percent or about 33[3] applicants are selected for admission. Mr. Engle testified that he took the MCAT test and was granted an interview request. However, he did not attend the interview because he put off going to medical school until his wife finished school. Although Mr. Engle testified that he had a grade point average of above 3.0 for his "GPA," the City asserts that the plaintiffs did not provide documents to support the claims. The City maintains that Mr. Engle was earning more after the accident than before, and the award of any future lost wages was unwarranted.
Mrs. Engle testified that she met Harold Engle in 1990 when she was 19 years old. At the time of trial, she had been married to Harold Engle for eight years. Mrs. Engle stated that her husband was an extremely conscientious, hardworking person. He would always take on extra jobs. Harold Engle started working in high school. He had a full-time job while he attended Brother Martin. In the first year of college, he worked at a restaurant. When he transferred to LSU, he took a full load of classes during the day and he worked at a Save-A-Center at night. He also did odd jobs around campus, and both Alicia and Harold would cut grass for the neighbors. At one point, Harold became an "RA", a residential assistant, at Power Hall on LSU's campus. He also worked in the kitchen and would tutor.
Mrs. Engle related that after they were married, Harold Engle worked full-time as a microbiologist. He continued to cut lawns and take on extra jobs. When he went to nursing school, he worked as a nursing assistant at East Jefferson Hospital and continued to cut lawns.
Mrs. Engle stated that Harold Engle scored in the 98 percentile on the test for nursing school. He had a good memory before the accident. He had a very high GPA although he was working while in *1182 school. Mrs. Engle testified that her husband intended to go to medical school and become a cardiologist. While in school full-time, they both worked but did not have enough money for her husband to go to medical school. They planned for him to wait to go to medical school until after she graduated, and she could teach. A student can only start going to medical school once a year. The accident occurred in April 1998, and Mrs. Engle did not graduate until December 1998. Harold had intended to go to medical school in the Fall of 1999 after his wife graduated.
Dr. Cornelius E. Gorman, an expert in vocational rehabilitation, testified for the plaintiffs. He had doctorate degrees in psychology and social work particular to his vocational rehabilitation degree awarded by the combined Departments of Education and Psychology.
Dr. Gorman stated that with reasonable probability, Mr. Engle had an IQ level of 125-130. Mr. Engle's verbal was at the 125 level, and now he is 19 points below that. Dr. Gorman explained that a learning disability occurs at a ten-point differential. Dr. Gorman stated that Mr. Engle's ability is not going to change after two years, which is the critical point of recovery.
Dr. Gorman was developing a treatment plan. He opined that a potential salary in nursing was $57,000 to $90,000 annually. Dr. Gorman thought that before the accident, Mr. Engle would become a "higher" level microbiologist versus a nurse, or he would attend medical school. Dr. Gorman testified that more probably than not, Mr. Engle could have gone to medical school, finances allowing. His background showed his intent to study medicine.
Presently, Dr. Gorman testified that Mr. Engle can only go to graduate school under exceptional assistance or intervention. Dr. Gorman said that it was not possible to expect Mr. Engle to be productive on the graduate record examination even if he were given extra time. Dr. Gorman related that Mr. Engle was working possibly to his own risk and that of others. At that time he was a business-oriented nurse as a marketing specialist. Now Mr. Engle is a salesman and is not working with patients. He is driving at least 800 miles a week. Dr. Gorman noted that Mr. Engle probably will not get promoted, and as he gets older, there is a risk that his employment will be interrupted. Dr. Gorman estimated that two gaps in his salary would equal the amount required for training in social work. Dr. Gorman said that Mr. Engle is overworking and has to be away from home much of the time. He expected that Mr. Engle would lose his present career, and attributed the loss to the trauma of Mr. Engle's head injury.
Dr. Gorman suggested an alternative career plan. Dr. Gorman said he could negotiate for Mr. Engle to be admitted to Tulane's graduate school of social work, which was a two and one-half to three-year program. Dr. Gorman believed he could get the graduate record examination waived or could get Mr. Engle's acceptance with a lower score. Dr. Gorman would orient and counsel Mr. Engle to work with traumatically brain injured patients. The goal would be for Mr. Engle to become a licensed clinical social worker ("LCSW"). He could be self-employed or work with LSU, Tulane or the State mental health system. Dr. Gorman has done this plan with a non-litigious young man who is employed. The cost of school would be $35,000-40,000 for two-three years. With extras the total would be $45,000-$50,000.
Dr. Gorman said he would not encourage Mr. Engle to engage in clinical nursing because it could be dangerous to patients, and it had a high dependence on memory. Dr. Gorman suggested a fallback goal was *1183 for Mr. Engle to try to get a part-time job as an intake and social services counselor in a skilled nursing home.
Dr. Gorman noted that Mr. Engle's current salary was $54,000. Dr. Gorman estimated that a social worker's annual salary would be $28,500-$40,000 with experience. Dr. Gorman remarked that Ochsner and East Jefferson Hospitals are competing for new graduates at an annual beginning salary of $28,500.
Dr. Gorman was familiar with 33 medical schools. He reviewed the range of salaries for various physicians. A radiologist's salary would be $260,000, and a pediatrician's salary would be $120,000 yearly. A doctor in New Orleans could net a salary of $137,113 for general or family medicine, which positions were less competitive. Mr. Engle had been interested in non-surgical cardiology, which would have an annual salary range of $145,127-$257,675. The average doctor had a salary of $164,000 in 1997, as compared to a general non-specialized physician's starting salary of $137,113.
Dr. Gorman referred to Mr. Engle's two bachelor's degrees in microbiology and nursing. A microbiologist, non-physician pathologist had a salary range of $35,365 to $137,687 yearly. Dr. Gorman said that some professors at UNO earn $125,000 to $200,000 yearly. Before the accident, Mr. Engle had the option of attending graduate school and obtaining a masters or PhD in microbiology. Mr. Engle could no longer go to graduate school or compete on the graduate record exam. Before the accident, Mr. Engle also could have obtained a masters degree in public health, a feeder course for medical school. A doctor of public health is in demand. Mr. Engle could have had the option of employment at the Center for Disease Control, paying $125,000-$175,000 yearly. Dr. Gorman reiterated that Mr. Engle can no longer become a professor.
Dr. Gorman also expressed that rehabilitation for a non-medical career including tuition would be $86,000-$105,000. He concluded that with a master's level social work training, the student could obtain additional professional course work through the University of Florida. The additional post-graduation courses, including training in budgeting and interacting with chronic pain patients, would lead to a salary higher than the conventional social worker's annual salary of $28,00-$40,000.
Dr. Gorman noted the relationship between stress and temper control. Dr. Gorman predicted that Mr. Engle should continue to see Dr. Katz or another doctor four times a year to be monitored and maintained on his medication for mood and behavior control.
Dr. Gorman related that it would take ten years for someone to complete medical training. During the first five years, the medical school's admissions office discouraged the students from outside work. As a resident from the sixth through the tenth years, the resident could earn a salary of $35,000-$42,000 yearly.
Dr. Gorman stated that Mr. Engle had great potential. Dr. Gorman noted that Mr. Engle worked throughout his schooling. He opined that Mr. Engle would have given 100%. He agreed that more probably than not, that but for the accident, Mr. Engle would have successfully gone into medical school. Dr. Gorman stated that it is more probable than not, Mr. Engle would have successfully completed medical school, and then he would have "become a doctor but for the accident."
Dr. Thomas R. Dalton, an expert in economics, testified on behalf of Mr. Engle concerning his earning capacity. He concurred with Dr. Gorman's estimate that Mr. Engle had about 31 additional years of *1184 work life. He assumed that Mr. Engle would be employed.
Mr. Engle's 2001 income was $56,264. He could have earned $60,000 as a nurse before the accident. Dr. Dalton found a loss of $13,530 in Mr. Engle's annual salary without more education. Dr. Dalton mentioned that Mr. Engle could earn $75,000 a year as a nurse from the date of the accident, and his past loss would be $81,009. Dr. Dalton said that Mr. Engle's future loss income was more significant than his past loss wages. Based on Dr. Gorman's testimony, Dr. Dalton found that Mr. Engle could not work as an RN with a salary of $75,000 after the accident because it entails high stress. Dr. Dalton opined that if Mr. Engle kept the same job that he presently has earning $52,264 annually as a nurse, the present value in 31 years would be $1,300,000. Dr. Dalton testified that if Mr. Engle did not attend medical school, he could have advanced to the graduate level in nursing to become a registered nurse, an RN, and could have earned an annual salary of $90,000 if he had not been injured. Dr. Dalton calculated that with additional nursing education (less the amount for the education), Mr. Engle could have earned $1,700,000 in 31 years.
Dr. Gorman expressed that the salary in public health ranged from $125,000-$175,000. Dr. Dalton opined that after paying off his education, Mr. Engle could have earned $150,000 a year with a master's degree in public health.
Dr. Dalton calculated that a new general practitioner, completing his training in 2009, would start off at a yearly salary of $194,000. This would be based on the present general physician's salary of $137,000 incrementing at three and a half percent in the year 2009. Dr. Dalton reviewed the approximate $137,000 figure given by Dr. Gorman. He took into account that the earnings stream is delayed for a long period of time for physicians. Dr. Dalton found that the difference if Mr. Engle stayed a nurse versus having gone to medical school would be a difference of $1,052,741.00, which would be using the low-end estimate.
Dr. Dalton estimated that the difference between his earning capacity as a social worker and the salary of a general practitioner would be $1,459,456. Dr. Dalton also figured that the salary of the "average physician [rather than a general physician] in the New Orleans area is going to make in 2009 is about $273,000." (Emphasis added.) Dr. Dalton stated that: "I took that income stream starting in 2009, grew it over time, etc., subtract from it what he could make as a nurse, took the present value of the difference, and its [sic] $2,416,830.00."
Dr. Dalton reviewed the figures he placed on the chalk board in the courtroom. He stated:
His future losses, and this is assuming that hehe would only have earned a bachelor's degree in nursing, in the absence of the accident, if he couldcould have made from now into the future, $75,000.00 a year, where it grows at three and a half percent per year, the present value of his loss if his earning capacity at the present time is that of a nurse, his losseshis present value of his losses are $443,329.00. If, however, his actual earning capacity is that of a social worker, then his losses are $850,044.00 or $900,044.00, if we include rehabilitation costs. If heif we look at a fast track scenario, in the absence of any additional education and in the absence of the accident, we have an initial earning capacity of $75,000.00. A fast track scenario is four and a half percent growth per year. His losses in comparison to a current earning capacity of a nurse, $697,105.00. If his earning capacity *1185 is that of a social worker, $1,103,820.00. Including rehabilitation costs, $1,153,820.00. If his earning capacity in the absence of the accident could have been $90,000.00, with no additional education, then his losses in comparison to an [sic] a nurse at present, [is] $798,257.00. If his earning capacity is that of a social worker, $1,204,972.00.
Dr. Dalton continued:
The second scenario that he would have received more education in the absence of the accident, specifically, that he would have received a master's degree in public health or in nursing, consider two scenarios here. One would have been, at the end of the educational process he would have made $90,000.00 a year. Of course, as education would have been a cost that we would have to take into consideration here and his earning capacity would have been delayed. So that loss in comparison to his present employment as a nurse, $345,976.00. If his earning capacity is that of a social worker, $752,691.00.
Dr. Dalton explained:
In public health, a master's in public health, Dr. Gorman told us could make $150,000.00 a year on average. The loss there in comparison to his present employment as a nurse, $1,462,168.00. In comparison to the earnings of a social worker, $1,870,883.00.
Dr. Dalton referred to a medical education as follows:
The final scenario [according to] Dr. Gorman was that he would pursue a medical degree, which is a ten year educational program. The first scenario under that category is that he would become a general practitioner and have present earnings of $137,113.00. In that case, in comparison to his present employment as a nurse, the present value of the loss is $1,052,741.00. In comparison to the earnings of a social worker, $1,459,456.00. Finally, Dr. Gorman told us that the average salary in 1997 of a doctor, all specialties included in the New Orleans area, was $164,000.00. The present value of the loss in comparison [with a] nurse's earnings: $2,010,115.00, in comparison with [a] social worker's earnings[,] $2,416,830.00.
Dr. Dalton agreed that he assumed that there would be some inflation when he calculated his projections of loss of income and earning capacity.
The defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortuous conduct. Wainwright v. Fontenot, XXXX-XXXX (La.10/17/00), 774 So.2d 70.
In Thornton v. National RR Passenger Corp., 2000-2604 (La.App. 4 Cir. 11/14/01), 802 So.2d 816, writ denied, XXXX-XXXX (La.3/15/02), 811 So.2d 907, the plaintiff was injured while working on a railroad car when it gave way, and pinned his hands down. Thornton had injuries to his hands resulting in the amputation of his finger. This court took into account the effect of his injuries on his ability to perform physically demanding jobs.
In Coleman v. Deno, supra, this Court took into account the effect of the loss of his arm on Coleman's ability to perform physically demanding jobs as well as his performance as a boxer. He had little education and a low IQ. Coleman depended upon his physical attributes for his livelihood. He could no longer engage in his previous life activities. The plaintiff's psychologist noted that because of his history as a boxer and his working in physical capacities, losing an arm, although catastrophic for anyone, meant more to the plaintiff than it would for example to a lawyer. The plaintiff's potential career as a boxer was considered.
*1186 In the present case, Mr. Engle's earning capacity was based on his mental abilities and his determination as a dedicated worker. His head injuries were more devastating to him in a professional medical career rather than in a career as a hard laborer as in Thornton and Coleman.
The record provides testimony that Mr. Engle had two college degrees in microbiology and nursing, and he had reached the interview stage of being admitted to medical school. Considering his employment background, it would be reasonable to determine that he was interested and capable of advancing in the medical field. Dr. Gorman was impressed with Mr. Engle's prior achievements to the extent that he intended to help Mr. Engle obtain the goal of a new career in social work. Dr. Gorman stated that more probably than not Mr. Engle would have attended medical school and would have finished his medical training as a physician. Alternatively, Dr. Gorman testified that nurses could earn $90,000 annually and with advanced education could have increased annual wages, compared to the annual salary of a general practitioner of around $137,000. Dr. Gorman also noted that a microbiologist, non-physician pathologist, had a salary range of $35,365 to $137,687 yearly. Dr. Gorman said that some professors at UNO earn $125,000 to $200,000 yearly. According to Dr. Gorman's testimony, Mr. Engle can no longer obtain advanced degrees in nursing, microbiology or teaching in those two fields.
Dr. Dalton estimated that the present value of the loss in comparison to a nurse's earnings was $2,010,115, and in comparison with a social worker's earnings, $2,416,830 based on an average physician's annual wages of $164,000 in New Orleans in 2009. The trial court chose the figure of $2,010,115 of the salary difference based on Mr. Engle's earnings as a nurse rather than in comparison with the figure of the greater difference of a social worker's earnings in the amount of $2,416,830.
Having reviewed the testimony of the witnesses, we cannot find that the trial court was clearly wrong in being impressed that Mr. Engle could have achieved his goal of finishing medical school. Even if the plaintiff did not attend medical school, he lost his ability to obtain advanced degrees to further his career as a nurse, microbiolgoist, professor, or as an employee in the public health field. Considering Mr. Engle's past education and employment history as a hard worker, the trial court could find that it was more probable than not that but for the accident, Mr. Engle would have pursued his education to obtain additional advanced degrees resulting in higher salaries that were comparable to a doctor's wages.
Although this Court's award may have been different from the trial court's award, we cannot say that the trial court's general damage award of $2,010,115 for future lost wages and earning capacity was an abuse of the trial court's vast discretion.

Loss of Consortium
The defendants also argue that the trial court's $100,000 award for the wife's loss of consortium is excessive.
An award for loss of consortium includes the loss of service, love and affection, society and companionship, support, overall contentment and happiness. Vaccaro v. Sports & Imports, Inc., 539 So.2d 989 (La.App. 4 Cir.1989). As previoiusly noted, La. R.S. 13:5106(B)(1) provides:
B. (1) In all suits for personal injury [involving the state or a state agency or political subdivision] to any one person, the total amount recoverable, including all derivative claims, exclusive of property damages, medical care and related benefits *1187 and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars. (Emphasis added.)
La. RS. 13:5106(D)(4) states:
(4) "Derivative claims" include but are not limited to claims for survival or loss of consortium. (Emphasis added.)
In Glankler v. Rapides Parish School Board, 610 So.2d 1020, 1036 (La.App. 3 Cir.1992), the Third Circuit found that the mother's consortium claim was derived from the daughter's injuries. The Third Circuit referred to Aldredge v. Whitney, 591 So.2d 1201, 1207 (La.App. 2 Cir.1991), in which the Second Circuit stated:
[In Shepard v. State Farm Mut. Auto. Ins., 545 So.2d 624 (La.App. 4 Cir.1989), the Fourth Circuit reasoned as follows:] A loss of consortium action is a derivative claim of the primary victim's injuries. The derivative claim does not come into existence until someone else is injured. Because the right of action in the loss of consortium claim is derived from the primary victim's injuries, recovery is restricted to the policy's per person limits. Therefore, if the injured party exhausts the per person limits, the derivative claim is extinguished. See Shepard at 629.
In Glankler, the Third Circuit opined:
Since we have concluded that Jennifer's general damages are limited under LSA-R.S 13:5106(B)(1) to the sum of $500,000, she has exhausted the total amount of recovery allowed her by statute. Therefore, we find that Glankler's derivative claim is extinguished.

Id., 610 So.2d at 1036.
In Coleman v. Deno, supra, this Court found that the consortium claim of the plaintiff's son was extinguished because the general damage award to the plaintiff/father exceeded the medical malpractice $500,000 ceiling cap.
In the present case, the wife's loss of consortium claim is derivative of the claim of her husband. The consortium award was extinguished by the husband's award of the amount of the ceiling or cap of $500,000 against the public entity, the City. The wife's consortium award is reversed.

CONCLUSION
Accordingly, we find that the City solely had garde or custody and solely was at fault for the defect in the street that caused Mr. Engle's injuries. The S & WB and the plaintiff were not at fault. The parties do not contest the trial court's award of $17,681.85 for medical/special damages. We amend the trial court's judgment to limit the general damage award to $500,000. We reverse the award for the wife's claim of loss of consortium. We affirm the trial court's award for Mr. Engle's future lost wages and earning capacity in the amount of $2,010,115.
AFFIRMED IN PART & REVERSED IN PART.
NOTES
[1] The plaintiffs' last name was incorrectly spelled "Engles" in the original petition.
[2] The City notes that in Castille v. State, 99-1334 (La.App. 3 Cir. 2/2/00), 758 So.2d 823, previously, La. R.S. 13:5106 was considered unconstitutional; however, the Louisiana Constitution was amended so that the amended statute is constitutional. The Third Circuit stated:

In 1985, the legislature passed Act No. 452 which amended La.R.S. 13:5106 to establish a $500,000 limitation on general damages in suits against the state, a state agency, or political subdivision. In Chamberlain v. State, Through DOTD, 624 So.2d 874 (La.1993), the Louisiana Supreme Court declared the statute to be unconstitutional, finding that it conflicted with Article XII, Section 10(A) of the Louisiana Constitution. In 1995, the legislature passed Act 1328 which proposed the amendment of Article XII, Section 10(C) of the Constitution to allow the legislature to "limit or provide the extent of liability of the state, a state agency, or a political subdivision in all cases." Act 1328 was approved by the people of this state and became effective November 23, 1995.
In conjunction with Act 1328, the legislature enacted Act 828 which amended La. R.S. 13:5106(B)(1) to limit the recovery of general damages to "the limit of liability in effect at the time of judicial demand." As of the effective date of the amendment, the limit of liability was $750,000. Thereafter, the limit of liability would be established on January 1 of each year by the Commissioner of Financial Institutions. In 1996, La. R.S. 13:5106(B)(1) was amended again to re-institute a fixed limit of liability of $500,000 on general damages. See Act 63 of 1996.
Castille, supra, pp. 1-2, 758 So.2d at 824-25.
[3] Five percent of 800 is 40. It is assumed that Dr. Gorman was speaking in generalities as to the estimated number of those admitted to medical school. It appears that he was speaking in generalities with regard to the 8000 applicants and the 800 who reached the interview level.